**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SAMUEL M. ROTTER<br><br>Plaintiff,<br><br>v.<br><br>VISION & BEYOND GROUP LLC, STANISLAV GRINBERG, PETER GIZUNTERMAN, DONALD FEATHERS, DAVID MIZRACHI and CHERYL WALTERS,<br><br>Defendants. | CIVIL ACTION No.<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Samuel M. Rotter, for his Complaint against Defendants Vision & Beyond Group LLC, Stas Grinberg, Peter Gizunterman, Donald Feathers, David Mizrachi, and Cheryl Walters (together, "Defendants"), states as follows:

**NATURE OF THE ACTION**

1. This matter arises out of the failure of Ohio-based real estate investment firm, Vision & Beyond Group LLC ("V&B" or "the Company"), to: (i) honor its contractual obligation to employ Samuel M. Rotter ("Rotter") as its Chief Operating Officer beginning November 1, 2021, (ii) pay Rotter the agreed compensation set forth in Rotter's written employment agreement, and (iii) apprise Rotter of material facts concerning the company's financial condition during the hiring process, thereby inducing Rotter to leave his previous secure, high-paying job in reliance on V&B's false financial representations.

2. Rotter, an award-winning real estate executive with more than 30 years' experience, gave up a lucrative position as Chief Operating Officer and Chief Financial Officer at a successful

1

New York real estate firm to take a position as V&B's Chief Operating Officer, in reliance upon assurances from V&B executives and board members that V&B had the financial wherewithal to employ Rotter.

3.      One month following full execution of an employment agreement with V&B ("Employment Agreement"), and just three business days before Rotter's scheduled November 1, 2021 start date, V&B informed Rotter that it would not employ Rotter as planned because V&B had purportedly fallen into financial difficulties – a fact which Defendants knew as early as August 2021 but failed to disclose to Rotter while still urging Rotter to quit his existing job.

4.      Rotter was ready, willing, and able to begin work with V&B on November 1, 2021, but V&B made it clear that it was reneging on the valid Employment Agreement it had entered into with Rotter.

5.      Although the Employment Agreement explicitly set forth the terms of Rotter's compensation, as well as a six-month severance package in the event of termination, V&B refused and failed to pay Rotter any compensation whatsoever, leaving Rotter without means of supporting himself and his family for a full year.

6.      Rotter commenced arbitration proceedings against V&B for breach of Rotter's Employment Agreement and received an award of $560,547.84 on his wage payment claims under the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 et seq. ("WPCL"), but V&B has failed and refused to pay the award.  Accordingly, Rotter brings this action against the individual officers and agents of V&B, who are personally liable for claims under the WPCL pursuant to 43 Pa. Stat. Ann. § 260.2a.

7. Rotter also asserts claims against the Company and certain individual Defendants for fraudulently or negligently misrepresenting and/or concealing V&B's alleged financial difficulties all the while urging Rotter to quit his then-current position and join V&B.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this dispute and personal jurisdiction over the Defendant pursuant to 28 U.S.C. § 1332(a)(1) because this is a civil action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

9. Complete diversity exists between the parties and the amount in controversy is well in excess of the $75,000.00 threshold pursuant to 28 U.S. Code § 1332(a)(1).

10. Rotter is a citizen of Pennsylvania.

11. Upon information and belief, after a reasonable inquiry, none of V&B's members are citizens of Pennsylvania. *See Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 110 (3d Cir. 2015) (holding that a plaintiff need not affirmatively allege the citizenship of each member of a defendant LLC if it is unable to do so after a reasonable investigation).

12. Upon information and belief, the members of V&B are: Stanislav E. Grinberg and Peter Gizunterman, as listed in the articles of incorporation V&B filed with the Ohio Secretary of State on April 22, 2019.

13. Based on searches of available public records, Grinberg maintains a permanent residence at 6983 Juniperview Lane, Cincinnati, Ohio 45243.

14. Based on searches of available public records, Gizunterman maintains a permanent residence at 1211 Caroline Street, Apartment 1706, Houston, Texas 77046.

15. Based on searches of available public records, Donald Feathers maintains a permanent residence at 3012 Pointeview Drive, Tampa, Florida 33611.

16. Based on searches of available public records, David Mizrachi maintains a permanent residence at 600 NE 14th Avenue, Apt 514, Hallandale Beach, Florida 33009.

17. Based on searches of available public records, Cheryl Walters maintains a permanent residence at 7308 Vinnedge Road, Fairfield Township, Ohio 45011.

18. All Defendants consented to the personal jurisdiction of this Court and waived any objection that venue in this Court is improper or inconvenient, pursuant to a valid and binding Agreement concerning the arbitration and litigation of this dispute ("Litigation Agreement"), dated May 6, 2022, which states as follows:

> 10. **Governing Law and Jurisdiction.** This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Pennsylvania. All proceedings concerning the enforcement or interpretation this Agreement or any dispute arising out of this Agreement shall be commenced and maintained only in the United States District Court for the Eastern District of Pennsylvania or the Court of Common Pleas of Bucks County, Pennsylvania. Each Party hereby consents to the personal jurisdiction of these courts and waives any objections that such venue is objectionable, improper, or inconvenient.

Litigation Agreement, § 10.

19. Further, this Court has personal jurisdiction over all Defendants and venue is proper in this District pursuant to § 28 U.S.C. 1391 and Pennsylvania's long-arm statute because, *inter alia*:

a) Pursuant to Rotter's Employment Agreement with V&B, Rotter was expected to "primarily work from [his] home in [Newtown] Pennsylvania," and thus, V&B contracted with Rotter to supply services within this Commonwealth (*see* 42 Pa.C.S.A. § 5322); and

b)     Defendants caused harm in this Commonwealth by an act or omission outside this Commonwealth by fraudulently or negligently misrepresenting/concealing material information, thereby inducing him to leave his secure, high-paying prior employment and failing to honor its contractual obligations with Rotter and pay him compensation due under the Employment Agreement.

20.     For all of the above reasons, venue is appropriate within this judicial district in that a substantial part of the events or omissions giving rise to the claim occurred. *See* 28 U.S.C. § 1391(b)(2).

## THE PARTIES

21.     Samuel M. Rotter is an individual residing at 122 Willow Drive, Newtown, Pennsylvania.

22.     V&B is an Ohio limited liability company with offices located at 2100 Auburn Avenue, Cincinnati, Ohio.  V&B is an investment firm focused on acquiring, managing, and developing multifamily communities in major, growing United States markets.

23.     Stas Grinberg is a Co-Founder and Managing Principal of V&B.

24.     Peter Gizunterman is a Co-Founder and Managing Principal of V&B.

25.     Donald Feathers is and was, at all relevant times, a member of the board of V&B.

26.     David Mizrachi is and was, at all relevant times, a member of the board of V&B.

27.     Cheryl Walters is and was, at all relevant times, V&B's Vice President of Human Resources.

28.     Grinberg, Gizunterman, Feathers, Mizrachi, and Walters were all top officers and managers of the Company who, upon information and belief, were directly involved in the decision not to pay Rotter the compensation due and owing to him under his Employment Agreement, and

therefore, they may be held personally liable under the WPCL if the Company fails to pay Rotter's

compensation.

## FACTUAL BACKGROUND

### Rotter's Employment Background

29.     With more than 30 years of experience as a finance and operations executive along with his credentials as a Certified Public Accountant (CPA) and Chartered Global Management Accountant (CGMA), Rotter is a highly qualified real estate executive who held a secure job for which he was highly compensated prior to the events at issue here.

30.     As of May 2021, when Rotter was first contacted concerning potential employment with V&B, Rotter had worked for MMS Group ("MMS") for approximately fourteen years, serving most recently as MMS's Chief Operating Officer and Chief Financial Officer.

31.     MMS provides property management and related services, with its headquarters in the greater New York City area, and operates in more than 20 states.

32.     As MMS's COO and CFO, Rotter managed a portfolio of properties exceeding 40,000 residential units worth billions of dollars collectively.  These properties include highly regulated subsidized rental properties (many with low income housing tax credits), affordable housing cooperatives, supportive housing, and conventional apartment buildings.  MMS's clients include building owners, governmental agencies, real estate entrepreneurs, financiers, not-for-profit organizations, and cooperative/condominium boards.

33.     When Rotter was approached about a potential position with V&B, he was a highly compensated executive at MMS.  Rotter earned approximately $2 million over the last five years of his employment with MMS, and he had been receiving a profit interest along with an equity stake in an MMS entity plus other compensation in addition to his base compensation, such that his foreseeable compensation expectancy for the next several years was considerably higher.

34.     Rotter's position with MMS was secure and Rotter was not actively seeking to leave MMS.

35.     Indeed, Rotter would not have left his position with MMS if not for V&B's overtures, its offer of employment on terms better than those Rotter had with MMS, and, most particularly, its representations concerning V&B's financial status and wherewithal to employ Rotter and pay his compensation.

**V&B's Courtship of Rotter and Employment Negotiations**

36.     On May 12, 2021, Stephaney Soto of the recruiting firm Janou Pakter initiated contact with Rotter concerning an open position with V&B.

37.     According to V&B's website https://www.V&Binvest.com/ V&B had over 100 assets, 2,300 multi-family units, and a portfolio value of about $235 million.

38.     Although Rotter was well employed and secure in his position with MMS, and although V&B was much smaller and less established than MMS, Rotter expressed interest in the opportunity with V&B because it promised greater opportunities for equity interests than his then-current position with MMS, in addition to a substantial base salary and bonus.

39.     Over the next several months, Rotter regularly communicated with V&B and its agents numerous times, including during a full day of in-person interviews in Cincinnati, Ohio on June 21, 2021.

40.     During the June 21, 2021 meeting in Ohio, Rotter met with Grinberg, Gizunterman, Feathers and Mizrachi.  During the meeting, Rotter questioned the financial wherewithal of V&B to be able to afford the compensation that was discussed.  Grinberg and Mizrachi assured Rotter that V&B could afford Rotter's compensation, and stated that the Company had $60 million in available funds.

41. Feathers and Mizrachi participated fully in the discussion on June 21, 2021 and heard Grinberg's and Mizrachi's assurances to Rotter concerning V&B's financial status. Neither Feathers nor Mizrachi corrected or challenged Grinberg's and Mizrachi's representations.

42. During this time, V&B actively encouraged Rotter to leave his job with MMS to join V&B as its Chief Operating Officer. The parties spent more than two months negotiating the terms of a definitive agreement.

43. On July 5, 2021, V&B made Rotter an offer of employment through recruiters at Janou Pakter.

44. On July 13, 2021, Rotter communicated directly with Grinberg and Gizunterman, V&B's two founding partners, to make a counteroffer in response to V&B's July 5, 2021 employment offer. In that communication, Rotter clearly stated that he had a secure, well-compensated position, which he was not willing to leave absent more favorable terms.

45. On July 16, 2021, the parties verbally agreed on compensation terms.

46. Rotter communicated the parties' verbal agreement to the recruiter, and Rotter made it clear that he would not give notice that he was leaving MMS until he had a signed agreement with V&B. In subsequent communications with V&B, Rotter continued to emphasize that a revised employment offer would not suffice, but rather Rotter would need a binding employment agreement.

47. Thereafter, from July through September, the parties traded drafts of a written employment agreement.

48. One of the drafting issues that required attention related to the logistics and tax implications of the equity component of Rotter's compensation. According to V&B, it had never granted equity to an employee, and was uncertain as to how to effect the parties' intentions. V&B

9

therefore requested that Rotter's attorney advise on the matter, although Rotter expressed concern about having to pay legal fees for drafting an important clause of an agreement V&B should be preparing.

49.     Rotter incurred $22,865.00 in legal fees for his own personal attorney to work on documentation at V&B's request and for its benefit, in reliance upon V&B's promises of employment and reimbursement of the legal fees Rotter incurred.

50.     Ultimately, the parties fully executed the final draft of the Employment Agreement on September 22, 2021.

51.     On September 22, 2021, after learning that V&B had executed the Employment Agreement, Rotter notified MMS that he was resigning and that his last date of employment would be October 22, 2021.

52.     MMS did not take the news well.  Nevertheless, Rotter continued to work for MMS through the effective date of his resignation.

**V&B's Abrupt Repudiation of the Employment Agreement**

53.     On October 5, 2021, V&B confirmed that Rotter's start date would be November 1, 2021.

54.     After receiving this confirmation, Rotter made travel arrangements, including booking flights and hotel in Cincinnati in preparation for his November 1, 2021 start date, in reliance on V&B's promise to reimburse him for those expenses.

55.     On or about October 15, 2021, Rotter informed Walters, V&B's Vice President of Human Resources, that Rotter had made travel arrangements to begin working in Cincinnati on November 1, 2021, as the Employment Agreement contemplated that Rotter would spend some time in V&B's Cincinnati offices during the first 90 days of his employment and thereafter work

10

primarily from his home in Pennsylvania.  Walters responded to this news with enthusiastic approval.

56.     On October 20, 2021, Rotter completed and signed various onboarding employee forms required for him to begin work at V&B.

57.     Rotter heard nothing further from V&B until October 27, 2021, when Rotter received a call from Grinberg stating that V&B would not go through with Rotter's impending employment because V&B was in financial trouble.

58.     During the October 27, 2021 call with Rotter, Grinberg stated that V&B knew about the financial trouble in August 2021 but had been trying to "work it out" and were continuing to do so.

59.     At no time prior to October 27, 2021 did V&B or its agents notify Rotter, directly or indirectly, that commencement of his employment with V&B was contingent on the company securing additional investment or capital from anyone.

60.     In fact, during his in-person interview in Cincinnati on June 21, 2021, Rotter questioned the financial wherewithal of V&B to be able to afford the compensation that was discussed.  In attendance were Grinberg, Gizunterman, and V&B board members Feathers and Mizrachi.

61.     During the June 21, 2021 meeting, Grinberg and Mizrachi assured Rotter that $60 million was available to fund acquisitions (which, when leveraged, could enable V&B to make between $300 million and $500 million in acquisitions), thus confirming that V&B would have plenty of funds to employ Rotter and pay his full compensation.  Gizunterman and Feathers fully participated in the discussion and did not correct or disagree with Grinberg's and Mizrachi's representations concerning V&B's financial wherewithal.

11

62.     Neither Grinberg nor any other V&B employee or board member remotely hinted that V&B was experiencing any financial distress at any time prior to October 27, 2021.

63.     Rotter offered to defer his salary until V&B was able to resolve its financial problems, which Grinberg indicated should occur in February or March 2022.

64.     V&B never responded to Rotter's offer to begin working while deferring compensation.  Instead, on November 17, 2021, despite the hardship V&B's actions caused Rotter, V&B offered to pay him only $25,000 in reimbursement for legal fees and travel expenses he incurred at V&B's request, in exchange for a full release.

65.     Rotter declined the offer because it did not include payment of any of the compensation due and owing to him, but required a full release of all claims.

66.     Subsequently, on December 16, 2021, Grinberg sent Rotter the following email purportedly terminating Rotter's employment pursuant to the terms of the Employment Agreement ("Termination Notice"):

> **From:** Stas Grinberg <stas@vnbinvest.com>
> **Date:** December 16, 2021 at 7:06:35 PM EST
> **To:** Cheryl Walters <cheryl@vnbinvest.com>, Sam Rotter <rottersam@gmail.com>
> **Subject: Notice of termination**
>
>
> Sam,
>
> We spoke on 10/27/2021 and I informed you that V&B would not be employing you.  Your attorney has claimed you're entitled to Notice of Termination under the purported Employment Agreement.  Without conceding that you are entitled to such Notice, and expressly reserving that you are not, for the avoidance of doubt V&B hereby gives Notice that your employment is terminated effective as of the date of this email, if not sooner, pursuant to ¶3b of the purported Employment Agreement.
>
> Kind regards,
> --

67.     The Termination Notice did not comply with the terms of the Employment Agreement, which specify as follows:

e.      Notice of Termination. Any termination of employment hereunder by any party shall be communicated by written notice of termination ("Notice of Termination") to the other party hereto. The Notice of Termination shall specify:

(i) The termination provision of this Agreement relied upon;

(ii) To the extent applicable, **a summary of the facts and circumstances claimed to provide a basis for termination of your employment under the provision so indicated**; and

(iii) **The applicable Termination Date.**

f.      Termination Date. Your "Termination Date" shall be:

(iv) If the Company terminates your employment hereunder for Cause, the date the Notice of Termination is delivered to you;

(v) **If the Company terminates your employment hereunder without Cause, the date specified in the Notice of Termination, which shall be no less than 30 calendar days following the date on which the Notice of Termination is delivered; provided that the Company may provide you compensation in lieu of notice**; and

(vi) If you terminate your employment hereunder, the date specified in your Notice of Termination, which shall be no less than 30 calendar days following the date on which the Notice of Termination is delivered; provided that the Company may waive all or any part of the 30-day notice period and provide you with payment in lieu thereof by giving written notice to you. For all purposes of this Agreement, your Termination Date shall be the date determined by the Company.

Employment Agreement, §§ 3(e)-(f) (bold added).

68.     The Termination Notice sent by Grinberg did not summarize "the facts and circumstances claimed to provide a basis for termination" of Rotter's employment, as required under the Employment Agreement.

13

69.     In addition, the Termination Notice specified that the Termination Date was "effective as of the date of this email, if not sooner," which violates Section 3(f)(v) of the Employment Agreement requiring 30 days' notice for termination without cause.

70.     Because V&B did not have cause to terminate Rotter's employment, the Employment Agreement required that the Termination Date be no less than 30 days following the date of the Termination Notice, unless V&B provided compensation in lieu of notice, which V&B did not do.

**Harm to Rotter Resulting from V&B's Actions**

71.     As a result of V&B's actions, Rotter was unemployed and without an income for over a full year, from October 22, **2021** through October 30, **2022**.

72.     Rotter made diligent efforts to find other suitable employment in his field, but his unemployment status made it extremely challenging for Rotter to secure a suitable new position.

73.     The Employment Agreement provides that any and all claims arising out of the Employment Agreement, including claims for compensation and statutory employment claims, must be resolved through binding arbitration.

74.     Rotter suffered a loss in compensation of over $400,000.00, which Mr. Rotter would have received from MMS during this timeframe.

**The Arbitration Proceedings and V&B's Failure to Pay the Award**

75.     Rotter initiated arbitration proceedings with the American Arbitration Association ("AAA") on April 11, 2022 ("Arbitration").

76.     Rotter initially named all of the Defendants in the Arbitration, but agreed to dismiss them without prejudice pursuant to the Litigation Agreement, which includes a tolling agreement

14

covering the claims asserted herein that does not begin to run until an award in Arbitration is collected by Rotter.

77.    On March 20, 2024, the arbitrator issued her award in the Arbitration, finding, *inter alia*, that V&B violated the WPCL by failing to pay Rotter compensation that was due and owing to him, and awarding Rotter a total of $560,547.84.

78.    Rotter made demand upon V&B to pay the award, but to date, V&B has refused and failed to do so.

79.    On December 24, 2025, Rotter filed a petition to confirm the Arbitration award in this Court, which was docketed to Civil Action No. 24-6849.

80.     Rotter will continue to pursue collection of the Arbitration award, but files this action in the meantime to pursue wage payment from V&B officers and agents, and further damages for harm arising out of Defendants' fraudulent or negligent misrepresentations/omissions inducing Rotter to leave his secure, well-paying position with MMS.

## COUNT I

### Violation of Pennsylvania Wage Payment & Collection Law

### (Against All Individual Defendants)

81.    Each of the above allegations is incorporated herein as though fully set forth in this cause of action.

82.    V&B entered into a valid, written agreement with Rotter to employ him as its Chief Operating Officer.

83.    Under the Employment Agreement, Rotter was to commence employment with V&B on November 1, 2021.

84.    The Employment Agreement specifies that V&B may terminate Rotter's employment, with or without cause, but only by written notice to Rotter specifying (i) the

15

termination provision of the agreement relied upon, (ii) a summary of the facts and circumstances claimed to provide a basis for termination of Rotter's employment under the provision so indicated, and (iii) the applicable termination date. Employment Agreement, § 3(e).

85. V&B did not provide or attempt to provide Rotter with a written termination at any time prior to December 16, 2021.

86. V&B purported to provide Rotter with written notice of termination by email dated December 16, 2021. The Termination Notice, however, did not comply with the terms of the Employment Agreement and was therefore ineffective, as detailed more fully above.

87. To the extent the Termination Notice were adjudged to be effective, V&B would owe Rotter – in addition to all compensation for the duration of Rotter's employment with V&B, including compensation during the 30-day termination notice period – six months' severance payable in a lump sum within 60 days of the Termination Date, according to Section 3(b) of the Employment Agreement:

> b. <u>Termination Without Cause or by Change Event.</u> Your employment hereunder may be terminated by you, or by the Company without Cause, or because of a Change Event. In the event of such termination, you shall be entitled to receive the Accrued Amounts and, subject to your compliance with your obligations under this Agreement and your execution of a release of claims in favor of the Company and its respective officers and directors in a form provided by the Company substantially similar to Appendix A (the "Release"), you shall be entitled to receive a lump sum payment equal to 6 months of Base Salary, less all applicable deductions and withholdings, paid within 60 days of your Termination Date.

Employment Agreement, §3(b).

88. Rotter complied with all material terms of the Employment Agreement, and was ready, willing and able to begin working for V&B on the appointed date of November 1, 2021.

16

Rotter even offered to begin working on a deferred compensation basis while V&B attempted to overcome its purported financial difficulties, but V&B ignored this offer.

89. At all times subsequent to November 1, 2021, Rotter has been ready, willing and able to perform work for V&B pursuant to the Employment Agreement.

90. The Employment Agreement specifies an annual base salary of $350,000 ("Base Salary"), "payable by the Company in accordance with its normal payroll practices," effective November 1, 2021. Employment Agreement, § 2(a).

91. In addition to his Base Salary, Rotter was to receive an annual incentive bonus with a target of 50% of his Base Salary ("Annual Incentive Bonus"), based upon certain "key performance indicators for a fiscal year… agreed to by [Rotter] and the Company in writing prior to the commencement of [the performance period]." The Annual Incentive Bonus was to be prorated in the first year of employment. Employment Agreement, § 2(b).

92. Further, beginning November 1, 2021, Rotter was granted the option to acquire an equity interest in any real property acquired by V&B in the ordinary course of its business. Employment Agreement, § 2(c).

93. Upon information and belief, since November 1, 2021, V&B has acquired real property in the ordinary course of its business.

94. In addition to the above compensation, Rotter was entitled to:

    a. 160 hours of paid time off in addition to company paid holidays;

    b. Participation in V&B's employee benefit plans;

    c. A car allowance of $500 per month, to be paid with the first paycheck of the month; and,

    d. Temporary housing for the first 90 days of employment.

Employment Agreement, §§ 2(d)-(g).

95. Despite Rotter's repeated demands, V&B refused to honor its obligations to employ Rotter and pay him any compensation, and thereby repudiated and breached its contract with Rotter.

96. As a result of V&B's breach of the Agreement Rotter has incurred substantial harm in an amount as yet to be quantified, including the loss of equity opportunities relating to properties V&B acquired since November 1, 2021 in addition to all past wages and compensation as described herein.

97. V&B was obligated to pay Rotter's base compensation on the Company's regularly scheduled paydays and to pay his other compensation in accordance with the terms of his Employment Agreement. *See* Employment Agreement, § 2.

98. V&B did not terminate Rotter's employment in accordance with the terms specified in the Employment Agreement.

99. To the extent V&B's December 16, 2021 purported Notice of Termination was valid and effective, V&B owed a contractual duty to pay Rotter six months' severance in addition to his unpaid wages.

100. Rotter was at all applicable times ready, willing and able to perform any and all work specified by his Employment Agreement with V&B.

101. V&B failed to pay any compensation due to Rotter or any severance.

102. V&B failed to pay Rotter for more than 30 days beyond the dates when Rotter's compensation was due and payable.

103. No good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such non-payment.

104.     Accordingly, in addition to recovering all compensation due and owing to him, Rotter is entitled to collect, as liquidated damages pursuant to 43 P.S. § 260.10, an amount equal to twenty-five percent (25%) of the total amount of wages due, including any severance and other benefits, as "wages" is defined under the WPCL.

105.     In addition, the WPCL provides that the tribunal "**shall**, in addition to any judgment awarded to the plaintiff or plaintiffs, allow costs for reasonable attorneys' fees of any nature to be paid by the defendant."  43 P.S. § 260.9a (f) (emphasis added).

106.     Under the WPCL, when a company fails to pay wages and benefits it owes an employee, the corporation's officers and agents may be held personally liable for the non-payments.  *See* 43 P.S. § 260.2a (defining "employer" to includes "every person, firm, partnership, association, corporation, receiver or other officer of a court of this Commonwealth and any agent or officer of any of the above-mentioned classes employing any person in this Commonwealth"); *Accurso v. Infra-Red Services, Inc.*, 169 F.Supp.3d 612 at 617 (E.D. Pa. 2016).

107.     Grinberg, Gizunterman, Feathers, Mizrachi and Walters were all officers, managers and/or agents of the Company who, upon information and belief, were directly involved in the decision not to pay Rotter the compensation due and owing to him under his Employment Agreement, and therefore, they are personally liable under the WPCL for the failure to pay Rotter's compensation.

WHEREFORE, Plaintiff Samuel M. Rotter requests that judgment be entered in his favor and against Defendants Grinberg, Gizunterman, Feathers, Mizrachi, and Walters, and that Plaintiff be awarded (i) compensatory damages in an amount to be established at the trial of this matter, (ii) statutory liquidated damages provided under the WPCL, (iii) Plaintiff's reasonable costs and

attorneys' fees and costs, (iv) pre- and post-judgment interest at the maximum allowable legal rate, and (v) such further relief as this Court may deem just and proper.

## COUNT II

### FRAUDULENT OR NEGLIGENT MISREPRESENTATION/CONCEALMENT

### (Against V&B, Grinberg, Gizunterman, Feathers, and Mizrachi)

108.  Each of the above allegations is incorporated herein as though fully set forth in this cause of action.

109.  At all times material hereto, Defendants Grinberg, Gizunterman, Feathers and Mizrachi, were authorized agents of V&B.

110.  During V&B's recruitment of Rotter, Rotter met with Grinberg, Gizunterman, Feathers and Mizrachi in person during an all-day meeting on June 21, 2021.  During the meeting, Rotter questioned the financial wherewithal of V&B to be able to afford the compensation that was discussed.  Grinberg and Mizrachi assured Rotter that V&B could afford Rotter's compensation, and stated that the Company had $60 million in available funds.

111.  Feathers and Mizrachi participated fully in the discussion on June 21, 2021 and heard Grinberg's and Mizrachi's assurances to Rotter concerning V&B's financial status.  Neither Feathers nor Mizrachi corrected, challenged, or qualified  Grinberg's and Mizrachi's representations in any way.

112.  On October 27, 2021, Rotter received a call from Grinberg stating that V&B was in financial trouble and therefore was electing not to go through with Rotter's impending employment.

113.  During the October 27, 2021 call with Rotter, Grinberg stated that V&B knew about the financial problems in August 2021 but had been trying to "work it out" and was continuing to do so.

114. Neither Grinberg nor any other V&B employees remotely hinted that V&B was experiencing any financial distress at any time prior to October 27, 2021, although the parties remained in regular communication.

115. V&B is not a public company, and therefore Defendants were the only available source of information to Rotter concerning the financial state of the Company.

116. Rotter could not have discovered V&B's financial distress by any reasonable means other than to learn the information from Defendants.

117. When Defendants learned in August 2021 that V&B was in serious financial distress such that it would be unable to pay Rotter's compensation, Defendants owed a duty to Rotter to disclose this information because it made their prior representations, made in June 2021, false and misleading.

118. Beginning at least as early as August 2021 – and continuing all the way through September 22, 2021 when Rotter tendered his resignation to MMS – Defendants had a clear opportunity to stop Rotter from irretrievably harming his position with his then-current employer by simply informing Rotter of the current financial state of affairs at V&B.

119. After months of leading Rotter on, Defendants had the chance to save Rotter from resigning his position at MMS by coming clean about the Company's dire financial situation, but Defendants chose not to do so.

120. The facts concerning V&B's financial troubles, which Defendants knew and failed to disclose, were basic and fundamental to the parties' negotiations concerning Rotter's employment, and to Rotter's decision as to whether to accept V&B's employment offer.

121. Unbeknownst to Rotter, Defendants knew of V&B's dire financial condition but fraudulently or negligently misrepresented and/or concealed it to induce Rotter to resign his employment with MMS while Defendants attempted to "work out" V&B's financial problems.

122. Rotter justifiably relied on Defendants' fraudulent or negligent misrepresentations/omissions to his detriment by resigning from MMS.

123. Because V&B failed to inform Rotter about its dire financial position at any point prior to September 22, 2021, and because V&B made false or misleading representations to Rotter about V&B's financial wherewithal to pay his compensation and failed to correct them at any point, Rotter voluntarily resigned from a secure, steady, well-paying position that he had held for almost fifteen years with a financially stable and highly successful company. As a result, V&B directly caused Rotter to suffer substantial financial harm.

124. As a result of Defendants' wrongful conduct, Rotter was harmed in an amount as yet to be determined, but which exceeds $75,000.

125. Defendants' actions were so outrageous as to demonstrate willful, wanton, and/or reckless conduct, warranting recovery of punitive damages.

WHEREFORE, Plaintiff Samuel M. Rotter requests that judgment be entered in his favor and against Defendants V&B, Grinberg, Gizunterman, Feathers, and Mizrachi, and that Plaintiff be awarded compensatory and punitive damages in an amount to be established at trial, pre- and post-judgment interest at the maximum allowable legal rate, and such further relief as this Court may deem just and proper.

Dated: February 18, 2025

Respectfully submitted,

POTOMAC LAW GROUP, PLLC

/s/ Susan V. Metcalfe
Susan V. Metcalfe (PA 85703)
630 Freedom Business Center Drive
3rd Floor
King of Prussia, PA 19406
Tel: 717-951-5653
Fax: 202-318-7707
smetcalfe@potomaclaw.com

*Attorneys for Plaintiff Samuel Rotter*

23